UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED SEP 2 3 2014

Innovative Design and Building Services, LLC,

             Plaintiff,

      –v–

Arch Insurance Company,

             Defendant.

12-cv-5474 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This is a breach of contract case arising out of a payment bond issued by Defendant Arch Insurance Company ("Arch"), as surety, and General Contractor J.K. Scanlan ("JKS"), as principal, in connection with the Orchard Hills Project. Plaintiff Innovative Design and Building Services, LLC ("IDBS"), a modular construction manufacturer and subcontractor on the Project, alleges that it is owed $4,748,191.00, plus prejudgment interest, under the terms of the payment bond. A nonjury trial was held in this action in 2014 on February 3, February 4, February 5, February 6, and February 7.

Pursuant to this Court's procedures for nonjury trials, the parties submitted the direct testimony of witnesses under their control by affidavit. The Court received direct examination declarations from Plaintiff witnesses Steven Scheinkman and Jolene Myers; and Defendant witnesses, Gordon Paterson, Stuart Markowitz, Ray Scuola, and Bruce Bergstrom. Each of these witnesses was cross-examined at trial. In addition, Defendant took direct testimony from Mr. Scheinkman and Ms. Myers in support of its affirmative defenses at trial, and read into the record certain excerpts from the deposition testimony of Ray Cudwadie. This opinion represents the

Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52. The Court's findings appear primarily in the "Findings of Fact" section, but some additional findings appear in the remaining sections of the opinion.

Briefly, the parties' dispute relates to the Orchard Hills Project ("Project"), a multifamily housing construction project in Newburgh, New York. Plaintiff IDBS entered into a series of seven subcontracts with general contractor JKS to manufacture and install modular units for the Project. Defendant Arch executed a surety bond to insure the payment of subcontractors on the Project. IDBS performed its subcontracts in full, but JKS was unable to pay in full, and IDBS sought to recover the unpaid balance from Arch as JKS's surety. Arch has asserted a number of defenses against liability; principal among them is its contention that IDBS is equitably barred from seeking recovery based on representations made during the course of the Project. The Court rejects these defenses, and judgment will accordingly be entered in favor of Plaintiff.

## I.   Findings of Fact

### A. Parties and Jurisdiction

Plaintiff IDBS is a limited liability company organized and existing under Delaware law. The sole member of IDBS is Innovative Building Systems, Inc. ("IBS"), a corporation organized and existing under Delaware law, with its principal place of business in Mechanicsburg, Pennsylvania. Joint Pretrial Order ("JPTO") § III. IDBS is related to two predecessor entities: (1) Excel Holmes, LLC ("Old Excel"); and (2) Excel Homes Group, LLC ("New Excel"). In short, the assets of Old Excel were acquired by New Excel, New Excel changed its name to IBS, and IBS is the sole member of IDBS. *See* Pl. Findings of Facts ("Pl. Facts") ¶¶ 67-74.

Defendant Arch is a corporation organized and existing under Missouri law, with its principal place of business in New York, New York. JPTO § III.

The Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds the statutory amount.

### B. Orchard Hills Project

The Orchard Hills Project ("Project") involved the financing and construction of 260 multifamily apartments in Newburgh, New York. The initial owner of the Project was Orchard Hills of Newburgh, LLC ("Owner" or "Orchard Hills"), and the General Contractor was J.K. Scanlan Company, Inc. ("JKS"). Pl. Facts ¶ 1.

The multifamily homes comprising the Project were built using modular construction: sections of the buildings called "modes" or "units" were manufactured offsite in indoor factories, transported to the construction site, and finally assembled to form the complete structures.

The Project was financed in large part by an approximately $50 million mortgage issued in May 2010 under the HUD Multifamily Accelerated Processing Program, pursuant to § 221(d)(4) of the National Housing Act, 12 U.S.C. § 1715*l*. Under that program, a private lender provides a mortgage for a housing project's construction, and HUD insures the mortgage and agrees to buy it out in the event of default. *See* 12 U.S.C. § 1715*l*. In this case, private lender Metropolitan Funding Corporation ("MFC") applied for and obtained a HUD-insured mortgage of approximately $50 million on behalf of Orchard Hills. *See* Def. Findings of Facts ("Def. Facts") ¶¶ 2, 21-23.

### C. Negotiations with Old Excel

In September 2009, JKS met with employees of Old Excel to discuss their potential involvement as modular subcontractors on the Project and negotiate an estimate. Def. Facts ¶ 3. On October 6, 2009, Old Excel, JKS, and Orchard Hills entered into a Letter of Intent ("LOI") providing that all three parties would "work diligently toward executing a Sales Agreement and a

3

Partnership Agreement on or before March 1, 2010." Ex. 1.  Pursuant to those agreements, JKS

and Orchard Hills would purchase the required modular units solely from Old Excel in exchange

for: (1) a $16,665,027.00 from JKS; (2) a separate $3 million contract from Orchard Hills; and

(3) an additional 5% ownership interest in the project, also coming from Orchard Hills.  *See* Def.

Facts ¶ 7; Ex. 1.

### D. Cost Review Analysis and Application to HUD

Meanwhile, MFC, Orchard Hills, and JKS worked towards satisfying the requirements

for HUD approval of the Project.  In October 2009, lender MFC retained Stuart Markowitz to

conduct the Cost Review Analysis required by HUD.  Def. Facts ¶ 10.  In the course of

conducting that review, Mr. Markowitz received documents indicating that the cost of the

modular construction on the Project would be $16,643,027.  Def. Facts ¶¶ 11-12.

Among the documents submitted to Mr. Markowitz was a November 20, 2009,

Memorandum of Understanding ("MOU") generated by Old Excel, which stated that it was the

intent of JKS and Orchard Hills to purchase "solely from [Old Excel]" the modular units

necessary for completion of the Project for a total of $16,665,027.  Def. Facts ¶ 12.  The MOU

omitted any reference to the separate $3 million in cash or 5% ownership interest provided for by

the LOI.  *See* Ex. 38.  After Mr. Markowitz noted the $22,000 discrepancy between the

$16,643,027 figure he had initially received and the $16,665,027 figure in the November 20,

2009, MOU, he received a revised MOU, dated December 7, 2009, stating that the contract price

was $16,643,027.  *See* Ex. 227 ¶ 13.  The revised MOU also omitted any reference to the

separate $3 million contract with Orchard Hills or contemplated 5% ownership interest.  Mr.

Markowitz relied on the revised December 7, 2009, MOU in concluding that the Project was

acceptable for the HUD program.  Ex. 227 ¶¶ 6, 14.

MFC submitted the Project to HUD on January 15, 2010, seeking approval of a $48 million loan. Def. Facts. ¶ 21. The submission stated that "[Old Excel] will provide the modular units" at a price of $16.6 million, reflecting the contract price set forth in the MOU submitted to Mr. Markowitz. *Id.* ¶ 22.

### E. Change in Ownership

On April 30, 2010, New Excel acquired certain assets and liabilities of Old Excel under an asset purchase agreement ("APA"). Def. Facts ¶ 24. Pursuant to the APA, New Excel expressly assumed liability for "the contracts and agreements . . . described on Schedule 4 hereto." Ex. 102, at 3. The October 9, 2009, LOI was listed on Schedule 4; the November 20, 2009, and December 7, 2009, versions the MOU were not. *See id.* sch. 4, p.2.

### F. Issuance of Bond and HUD Closing

Orchard Hills and JKS approached Arch to obtain the necessary payment and performance bonds for the Project in April 2010. Def. Facts ¶ 36. Arch considered the Project's status as a HUD-insured project very attractive from an underwriting perspective. Def. Facts ¶ 37.

As part of its underwriting process, Arch requested that New Excel obtain payment and performance bonds for its subcontract. Def. Facts ¶ 38. In order to comply with this request, New Excel employee Jay Kedia provided Arch with a "Sunshine Letter" stating that New Excel had been a client of Travelers Casualty and Surety Company "for over 10 years," during which time New Excel had "completed and [Travelers had] bonded projects in the $5,000,000. [sic] range for a wide variety of owners." Ex. 56. The letter further stated that it was Travelers' opinion that New Excel "[was] qualified to perform [the Project], which [it] underst[ood] [to]

ha[ve] an estimated contract price to be [sic] approximately $20,000,000." *Id.*  At the time of the letter, New Excel had been in existence for less than a month.  *See* Def. Facts ¶ 24.

The HUD-insured loan closed on May 25, 2010.  At that time, the Prime Contract between Orchard Hills as owner and JKS as general contractor was executed, as were the payment and performance bonds naming JKS as principal and Arch as surety.  Def. Facts ¶ 41; Pl. Facts ¶ 1.

### G.  Modular Subcontracts

At some point following the formation of New Excel, New Excel determined that the terms of the original deal, outlined in the LOI, were unacceptable and sought to renegotiate.  *See* Tr. 145:24-146:15; Ex. 14.  Ultimately, JKS and IDBS entered into a series of seven subcontracts for the completion of the modular construction.  Pl. Facts ¶¶ 3-5.  In contrast with the deal contemplated by the LOI, the seven subcontracts dealt exclusively with JKS, and were exclusively for cash.  *See id.*

JKS and IDBS entered into the first subcontract on October 21, 2010, for the supply and installation of modular units at the Project site for $3,786,000.  Pl. Facts ¶ 3.  JKS and IDBS entered into subcontracts two through five on December 17, 2010, for a total sum of $12,712,248.  Def. Opp. Facts ¶ 4.  JKS and IDBS entered into the two final subcontracts on April 25, 2011, for $3,177,000 and $3,885,400 each.  Pl. Facts ¶ 5.  Thus, under the terms of the seven subcontracts, JKS was itself liable to IDBS for the entire contract price, which totaled $23,560,648, subject to certain surcharges and credits.  This amount far exceeded the approximately $16 million of the HUD-insured mortgage allocated to modular construction.  *See* Def. Facts ¶ 11.

6

### H. Performance Bond Claim and Investigation

On June 9, 2011, John Scanlan of JKS wrote a letter to IDBS indicating that JKS was experiencing financial distress and could not perform the subcontracts as written. Ex. EEE. The letter began, "[a]s you are aware, we started the [Project] with a significant financial whole [sic] because of the deal with [Old Excel] not coming to fruition," and continued, "[t]o date, I have not been able to [close the financial gap]." *Id.* In light of these issues, Mr. Scanlan wrote that he would "have to cancel the orders [buildings 4, 13, and 11 under subcontract 7]." *Id.*

The letter also disclosed that JKS was "having difficulty" with Orchard Hills—the original owner of the Project. Ex. EEE. These issues reached a head when, on June 22, 2011, an attorney for Orchard Hills made a claim on JKS's performance bond, alleging, that JKS had "committed a material anticipatory breach of its agreement by . . . seeking a contract price increase of $6,111,149 for work that falls squarely within its contractual scope." Pl. Facts ¶ 8; Ex. CCCC. The claim letter further asserted that JKS had "only contracted for 20 of the required 29 buildings," despite exhausting the available funds. Pl. Facts ¶ 10; Ex. CCCC. At the request of Mr. Scanlan, Ex. 97, IDBS provided Arch with a letter confirming that all of the modular units required for the Project were under contract, *see* Ex. GGG.

Meanwhile, Arch conducted its own investigation of the claim. Over the course of that investigation, Arch discovered that Orchard Hills in fact had no standing to make a claim on the payment bond, as JKS had acquired its ownership interest in the Project. Pl. Facts ¶ 18. Arch was, furthermore, informed of the circumstances surrounding the financing gap alluded to in Scanlan's letter to IDBS. As Arch claims specialist Gordon Patterson explained in a June 23, 2011, email, "[JKS's] position . . . reflects a change in the form of compensation to be received by the modular unit manufacturer [IDBS]." Ex. HHH. "Due to a change in ownership, [IDBS]

chose to forego the equity interest for an additional $6 million to the subcontract." *Id.*  Arch understood that this gap in funding was the cause of the instant performance bond claim.  *Id.* However, Arch apparently accepted Mr. Scanlan's assurances that "the remaining equity partners [were] providing the extra funding" and that the gap was "a dead issue." *Id.*

Arch ultimately denied Orchard Hills' performance bond claim.  *See* Pl. Facts. ¶ 22; Ex. III.  In the letter explaining its decision, Arch cited: (1) the fact that Orchard Hills no longer had standing to make the claim—as JKS now held the controlling interest in the Project; (2) the fact that "anticipatory breach" did not "rise to the level of either a contract default or a justification for termination of the contract"; and (3) the letter from IDBS stating that all of the modular units were under contract.  *Id.*

## I.   Breach of Subcontracts and Payment Bond Claim

Despite Mr. Scanlan's assurances to IDBS and Arch, JKS continued falling behind on its payments.  By November 30, 2011, JKS owed IDBS $2,409,717, along with retainage of $188,288.  Pl. Facts ¶ 34.

On January 20, 2012, as a condition of completing construction on the final three buildings (which had previously been cancelled because of JKS's financial difficulty), IDBS and JKS entered into an Amendment to Subcontract Agreements One Through Seven ("January 20 Amendment").  Pl. Facts ¶ 40; Ex. M.  Among other things, the Amendment gave IDBS the right to accelerate all balances, including retainage, due under the subcontracts in the event that JKS defaulted by failing to make a required payment.  *See id.* § 6.

On February 10, 2012, IDBS notified Arch of the extent of the unpaid balance and of the fact that, pursuant to the January 20 Amendment, "[a]ll payments become immediately due and payable in the event [JKS] defaults any of its payment obligations to IDBS." Ex. GG.  The letter

further indicated that IDBS and JKS had "tentatively agreed" to a payment plan, which IDBS

was "willing to accept, provided that [Arch] agrees that such payment plan does not jeopardize,

waive or in any manner prejudice any of IDBS's rights under the payment bond, and further

provided that IDBS is comfortable that it will receive payment from Arch in a timely manner

should it be required to make a claim on the payment bond." Ex. GG.

On February 17, 2012, IDBS made a claim on the payment bond. Pl. Facts ¶ 51.  At the

time, IDBS submitted an "Affidavit of Claim" providing documentation of an unpaid balance in

the amount of $2,458,302, plus $628,756 in retainage. *See id*; Ex. KK.

Meanwhile, IDBS continued performance under the subcontracts, and by April 12, 2012,

all of the modular units had been installed on the site of the Project. Pl. Facts ¶ 56.  Following

installation of the modular units, IDBS sent a letter to Arch demanding immediate payment of

$744,892.56, representing amounts due on subcontract 7. Pl. Facts ¶ 58; Ex. MM.  The letter

concluded:

> Although [JKS] has now defaulted under the aforementioned forbearance
> agreement and IDBS has every right to accelerate the entire debt and demand that
> Arch pay this much greater amount right now, IDBS is willing to accept the
> $744,892.56 in partial satisfaction of [JKS's] and Arch's obligations to IDBS and
> continue to forbear on the balance pursuant to the terms of the forbearance
> agreement.  However, if this payment is not made immediately, IDBS will have
> no choice but to pursue recovery of the entire debt.  Nothing in this letter is to be
> construed as a waiver of any of IDBS' rights, including the right to seek all
> amounts due and owing from [JKS] and/or Arch, and IDBS expressly reserves all
> such rights.

Ex. MM.

On April 23, 2012, IDBS accelerated the entire balance of the subcontracts because of

JKS's continued failure to "make payment to IDBS for all of the amounts due and owing

pursuant to the terms of the payment schedules," as well as JKS's failure to "pay the retainage

amounts currently due and owing." Ex. Y. That same day, IDBS updated its claim with Arch to reflect the acceleration of the subcontract amount. Pl. Facts ¶ 59; Ex. U.

On April 27, 2012, and May 9, 2012, Arch made two payments totaling $744,892.56—reflecting the amount demanded in the April 12, 2012, letter. Ex. FFFF ¶¶ 49-50. Since that time, Arch has made no further payments to IDBS. *Id.* ¶ 51.

## II.  Affirmative Defenses Based on Pre-Closing Conduct

The Court first addresses Arch's argument that IDBS is barred from any recovery at all by virtue of the conduct of IDBS's predecessors, or by virtue of IDBS's own conduct prior to the closing of the deal.

### A.  Memorandum of Understanding and Equitable Estoppel

First, Arch argues that IDBS is barred from recovery because of its conduct in "creat[ing] the false MOU," which Arch describes as "the linchpin by which HUD ultimately approved" the project. Def. Mem. 4. In particular, Arch argues that "IDBS (through the acts of Old Excel), both made false representations and concealed material facts in the MOU for the purpose of obtaining approval of the Project by HUD." Def. Mem. 5. IDBS counters by arguing, among other things, that "Arch has failed to meet its burden of establishing that IDBS assumed any liability for Old Excel's alleged fraud and misconduct, and as such, the Court need not consider any of the events surrounding the MOU." Pl. Opp. 3.

"It is the general rule that a corporation which acquires the assets of another" is liable for neither the torts, *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 (1983), nor breaches of contract of its predecessor, *Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 626 (S.D.N.Y. 2007) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003)). In order for a corporation to be held liable for its predecessor's torts or breaches, one of the following four

exceptions must apply: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Schumacher*, 69 N.Y.2d at 245. Because none of these exceptions apply in this case, the Court finds that the creation of the MOU cannot form the basis of any affirmative defense barring IDBS from recovery.

The Court rejects Arch's argument that New Excel expressly assumed Old Excel's liability for "the LOI and its accoutrements (the MOU and the State approvals)" under the terms of the APA. Def. Mem. 16. While the October 9, 2009, Letter of Intent is among the contracts expressly assumed under the APA, the MOU is not. *See* Ex. 102 Sch. 4, p. 1. Under the doctrine of *expressio unius*, the express inclusion of the LOI raises an inference that the MOU was intentionally *excluded* from the contract. *See IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 590 F. Supp. 769, 773 n.19 (S.D.N.Y. 1984). Arch has given no reason why this general principal should not be applied in this case, *cf. Soc'y for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, No. 98-cv-2135 (LMM), 1999 WL 33023, at *7 (S.D.N.Y. Jan. 21, 1999) (citing *Thomas v. Price*, 631 F. Supp. 114, 122 (S.D.N.Y. 1996) (refusing to apply *expressio unius* "in the face of directly contradictory language in the contract"), and the Court can see none. Accordingly, the Court finds that New Excel did *not* expressly assume liability for the MOU.

Nor does the Court agree with Arch's argument that New Excel impliedly assumed liability for the LOI and MOU. Def. Mem. 16. "While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the

11

seller." *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977).  In

this case, Arch contends that New Excel impliedly assumed liability for the MOU by "pa[ying]

$3.5 million to resolve issues in connection with the contracts assumed in the APA."  Def. Mem.

16 (citing Ex. 79, p.2; Tr. 136-38, 298-99).  However, Scheinkman's testimony regarding that

$3.5 million, which the Court found credible, shows that those payments arose from liabilities

*expressly assumed in the APA. See* Tr. 299:5-17.  This conduct therefore offers no support

whatsoever for Arch's argument of implied assumption of liability—to the contrary, it weighs

against such a finding.  Even if these payments had not arisen under the express language of the

APA, "[t]he mere fact of voluntary payment of some of the debts of the predecessor will not

ground an inference that the successor assumed all of the former's debts."  *Marenyi v. Packard

Press Corp.*, No. 90-cv-4439, 1994 WL 16000129, at *7 (S.D.N.Y. Jun 9, 1994) (citing 15

William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7124).

Accordingly, the Court finds that the MOU was not impliedly assumed by New Excel.

        The Court's conclusion that IDBS is not liable for the MOU holds even when the issue is

viewed, as Arch urges, "in the context of HUD's strict rules, regulations and procedures."  Def.

Mem. 11.  Whether or not HUD would have approved the Project "had [it] been apprised of the

actual agreement among the parties as set forth in the LOI, as opposed to being provided the

false MOU," Def. Mem. 13, is irrelevant, given that IDBS did not assume any liability for the

MOU.  Moreover, Arch has failed to articulate any reason why "the context" of the HUD

program should preclude IDBS from recovering in this case.  In Arch's own words, "Congress

intended the National Housing Act to benefit the public, and HUD's procedures are designed to

protect HUD's insurance fund."  Def. Mem. 11-12 (citing *Berks Prod. Corp. v. Landreau*, 523 F.

Supp. 304, 310 (E.D. Pa. 1981)).  The HUD insurance fund, however, is not at risk in this

litigation, distinguishing this case from those relied upon by Arch. *Cf. Mursor Builders, Inc. v. Crown Mountain Apartment Assocs.*, 467 F. Supp. 1316 (D.V.I. 1978) (finding that claimant's failure to abide by HUD regulations precluded recovery from HUD); *United States v. I-12 Garden Apartments*, 703 F.2d 900 (5th Cir. 1983). Indeed, *Mursor Builders* not only emphasizes the significance of the "public treasure (or purse)" to its conclusion, but also directs the plaintiff "to look to the *economically viable private parties* for any recovery it might have." 467 F. Supp. at 1335 (emphasis added). As one such economically viable private party, Arch can find no defense from recovery in that case.

### B. Duty to Speak

Arch next argues that, even if IDBS was not itself responsible for the statements made in the MOU, it had an obligation to disclose what it knew regarding the LOI and MOU prior to closing, and that its failure to do so estops it from recovering under the payment bond. The Court disagrees.

### 1. Sunshine Letter

Arch argues that IDBS should be estopped on the basis of "the sunshine letter written on behalf of New Excel," which it alleges "contained false representations that New Excel was a long standing Travelers account (which it was not) and that it had completed projects in the $5 million (which it had not)." Def. Mem. 6. According to Arch, these "'half-truths' or deceptive statements" gave rise to a duty for New Excel to "disclose the existence of the LOI or that [it] was to have a separate $3 million contract with the developer Barnett." Def. Mem. 9.

Under New York law, "a party to a business transaction" has an affirmative duty to speak "where the party has a made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."

13

*Brass v. Am. Film Techs. Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Junius Constr. Co. v.*

*Cohen*, 257 N.Y. 393, 400 (1931) (Cardozo, J.)).  For example, in *Junius Construction*, a seller

warned a prospective buyer of a plot of land "that the opening of streets on the east and west

might modify in the future the exterior boundaries," but withheld information "that there was

another street (Rutledge street), which, if opened, would cut the plot substantially in half." *Id.* at

396.  Under these circumstances, the court found that the plaintiff buyer has stated a claim for

false representation, reasoning that "[t]he enumeration of two streets, described as unopened but

projected, was a tacit representation that the land to be conveyed was subject to no others, and

certainly subject to no others materially affecting the value of the purchase." *Id.* at 400.

       The Sunshine Letter triggered no similar duty to disclose the LOI or the contemplated

side deal with developer Barnett.  The duty to speak arises with respect to "the erroneous

impression *created by the ambiguous representation*." *Sheridan Drive-In, Inc. v. State of New*

*York*, 228 N.Y.S.2d 576, 585 (4th Dep't 1962) (emphasis added).  As Arch itself recognizes, the

Sunshine Letter's alleged misrepresentations concerned the duration of New Excel's relationship

with Travelers and New Excel's bonding capacity—that is, the letter created the false impression

that New Excel had been a Travelers customer for ten years, during which time it had obtained

bonds in the "$5,000,000. [sic] range." *See* Def. Mem. 9; Ex. 56.  To the extent that these

statements provided Arch with "only half of the truth," *Brass*, 987 F.2d at 150, the whole truth

required to be disclosed was the actual duration of New Excel's relationship with Travelers and

New Excel's actual bonding capacity—not the existence of the LOI and contemplated side deal.

Because the Sunshine Letter gave rise to no duty to disclose the LOI and contemplated side deal,

it cannot form the basis of an affirmative defense of estoppel or unclean hands in this case.

14

The Court's conclusion that the Sunshine Letter did not give rise to a duty to disclose the LOI or contemplated side deal is further bolstered by what the letter *did* disclose about the contemplated modular subcontract. The letter states: "It is [Travelers'] opinion that [New Excel] is qualified to perform [the Project], which [Travelers] understand[s] has an estimated contract price to be approximately $20,000,000., [sic] with the performance and payment bond valued up to $4,000,000." Ex. 56. The crux of Arch's numerous defenses is its allegation that it had reason to believe that the total price of the modular subcontract would be $16 million. *See* Tr. 714:22-25 (Bergstrom testifying that "we thought it was 16 million, if somebody told us it was for [sic] in excess, and we would have had a big problem"). However, the basis for this belief was not the Sunshine Letter, which clearly stated that the contract price was "estimated . . . to be approximately $20,000,000." Ex. 56. The Court is unpersuaded by Arch's counterpoint that "it's very typical in the surety industry for the brokers to give a larger number." Tr. 713:18-22. Even if this were true, it would mean that the pricing information in the Sunshine Letter was of little probative value, and not that the pricing information in the Sunshine Letter was misleading. Arch cannot simultaneously argue that the $20 million price estimate set forth in the letter was effectively meaningless, and that the letter caused them to believe that the subcontract had a price of only $16 million.

Nor is the Court persuaded to alter its analysis by considering the Sunshine Letter in the broader "context of HUD's strict rules regulations and procedures." Def. Mem. 11. Unlike the MOU, the Sunshine Letter is not alleged to have played any role in HUD's approval of the Project. *Cf.* Def. Mem. 13 (characterizing the MOU as the "linchpin" for HUD approval without discussing the Sunshine Letter). And, as previously discussed, this case does not obviously implicate HUD's interest in protecting the public purse, as the only purse at risk is that of the

15

private entity Arch. *Cf. Mursor Builders*, 467 F. Supp. at 1335 (refusing to allow "recovery by plaintiff from the public treasure (or purse)").

## 2. Special Facts or Superior Knowledge

Arch further argues that "IDBS was . . . obliged to make further disclosure" of the LOI and contemplated side deal "[u]nder the 'special facts' or 'superior knowledge' doctrine." Def. Mem. 10. Again, the Court disagrees.

New York law "recognizes a duty by a party to a business transaction to speak . . . 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Brass*, 987 F.2d at 150 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)). But even assuming that IDBS was in possession of "superior knowledge, not readily available" to Arch regarding the LOI and contemplated side deal, the affirmative defense must fail because "it is clear that [IDBS] [was] not [a] 'part[y] to the transaction'" with Arch. *Estate of Ginor v. Landsberg*, 960 F. Supp. 661, 669 (S.D.N.Y. 1996) (finding no duty to disclose where party asserting claim was not a party to the allegedly fraudulent transaction). As Bergstrom testified, Arch had no contact with New Excel during the underwriting of the bonds. Ex. 226 ¶ 22. The lack of contact between New Excel and Arch also precludes the Court from finding that New Excel "kn[ew] that [Arch was] acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150; *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 155-56 (2d Cir. 1995) (finding no duty to disclose where party asserting claim failed "to show that [adversary] knew that [party] was acting in reliance on mistaken knowledge regarding that issue."). Thus, New Excel had no duty to disclose the LOI and contemplated side deal to Arch on the basis of its superior knowledge of those facts.

### C. Letter of Intent and Promissory Estoppel

Arch next asserts that IDBS is barred from recovery under the doctrine of promissory estoppel. Def. Mem. 14-15. Specifically, Arch argues that the contracts upon which IDBS seeks to recover "are void based on duress and lack of consideration, given that New Excel was already obligated to supply and install the modular units" under the LOI. *Id.* at 15. This defense fails too.

Tellingly, this case bears no meaningful resemblance to those cited by Arch in support of its defense of promissory estoppel. *Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124 (1971), for instance, involves the entirely separate affirmative defense of economic duress and does not address promissory estoppel at all. But even if Arch had not waived the defense of economic duress by failing to plead it in its answer or otherwise raise it at a time when IDBS could fairly respond, *see Sompo Japan Ins. Co. of Am. V. Norfolk S. Ry. Co.*, -- F.3d --, 2014 WL 3844155, at *8 (2d Cir. Aug. 6, 2014), the Court would find that the defense had not been established in this case. Economic duress requires proof that (1) "immediate possession of needful goods is threatened," (2) "the threatened party could not obtain the goods from another source of supply," and (3) "the ordinary remedy of an action for breach of contract would not be adequate." *Austin*, 29 N.Y.2d at 130-31 (finding that economic duress has been established where subcontractor coerced prime contractor to higher contract price by withholding delivery of parts necessary to meet prime contractor's obligations to Navy). Thus, even assuming that IDBS's refusal to perform the agreement contemplated by the LOI could be characterized as a threat to the "immediate possession of needful goods," the defense would nevertheless fail as Arch has not even attempted to prove the second and third of these elements. *See* Def. Mem. 14-15.

17

Nor is Arch otherwise able "[t]o make out a claim for promissory estoppel," which requires proof of "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996). In *Montgomery Industries International, Inc. v. Thomas Construction Company, Inc.*, 620 F.2d 91 (5th Cir. 1980), for example, general contractor Thomas Construction Company solicited bids from trash disposal systems suppliers in order to formulate its own bid for the construction of a hospital in Texas. *Id.* at 92-93. In response to these inquiries, Trans Vac (a subsidiary of the plaintiff) submitted a bid in the amount of $287,000 to Thomas. *Id.* at 93. Thomas used this bid to estimate its own costs and to formulate its own bid for the project, which it won on the basis of being the lowest bidder. *See id.* at 93. Subsequently, Trans Vac refused to perform at its bid price—placing Thomas in the unwelcome position of either "refus[ing] the increased price" to pursue legal remedies, with the attendant risk of performance delays, or accepting increased costs for which it would itself receive no compensation from the hospital. *Id.* at 94. Under these circumstances, the Fifth Circuit found that Trans Vac was estopped from revoking its initial bid, which constituted a clear and unambiguous promise to perform for $287,000, which Trans Vac had "submitted . . . knowing that Thomas would rely on it in preparing the bid to the [hospital project];" and upon which "Thomas did in fact rely to its detriment . . . in the bid [for the hospital project]." *Id.* at 94.

Here, by contrast, IDBS made no such "clear and unambiguous" promise that the subcontract could be performed at a lower price. The LOI did not actually obligate IDBS to provide the contemplated modulars at a particular price, but merely constituted an agreement to "work diligently toward executing a Sales Agreement and Partnership Agreement on or before

18

March 1, 2010," pursuant to which Old Excel would sell Barnett and JKS 868 modular units in exchange for approximately $21.6 million in consideration. Ex. 1. Thus, whether or not the LOI was an enforceable agreement is immaterial, as the Court finds that it is not "a clear and unambiguous promise" regarding the price of the modular subcontract, *Readco*, 91 F.3d at 301, and therefore cannot give rise to a valid defense of promissory estoppel. *Cf. R.B. Ventures, Ltd. v. Shane*, No. 91-cv-5678 (CSH), 2000 WL 12118, at *4-5 (S.D.N.Y. Jan. 7, 2000) (finding that initial agreement to pay broker 6% commission did not estop subsequent agreement to pay 2.5% commission, where broker had not yet produced a ready, able, and willing purchaser and was accordingly not yet entitled to the commission). Nor did JKS reasonably and foreseeably rely to its detriment upon the LOI in formulating its bid for the Project. *See Readco*, 91 F.3d at 301. After all, JKS was well aware that the amount of consideration set forth in the LOI exceeded the estimated cost of the subcontract set forth in its submissions to HUD. *See* Ex. 1. Indeed, Arch presents no theory of detrimental reliance at all. *See* Def. Mem. 14-15. Having thus failed to establish these elements of the defense, Arch's promissory estoppel argument must be rejected.

## III. Affirmative Defenses Based on Post-Closing Conduct

The Court next turns to Arch's argument that IDBS is estopped from recovering certain portions of the contracts because of its "own misconduct" during the course of construction. Def. Mem. 17.

### A. The Law of Equitable Estoppel

Prior to addressing the particular iterations of the defense raised by Arch, the Court pauses to discuss the law of equitable estoppel.

Equitable estoppel is "imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom

enforcement is sought and who, in justifiable reliance upon the opposing party's words or

conduct, has been misled into acting upon the belief that such enforcement would not be

sought." *Readco*, 81 F.3d at 301 (quoting *Nassau Trust Co. v. Montrose Concrete Prods.*

*Corp.*, 56 N.Y.2d 175, 184 (1982)).  Estoppel requires an examination of the conduct of both

the party to be estopped and the party asserting the defense.  The party to be estopped must have

"(1) [engaged in] conduct which amounts to a false representation or concealment of material

facts; (2) inten[ded] that such conduct [would] be acted upon by the other party; and (3)

[known] the real facts." *Readco*, 81 F.3d at 301 (quoting *Airco Alloys Div., Airco Inc. v.*

*Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (4th Dep't 1980)) (first three alterations

in original).  The party asserting the defense, on the other hand, must show that it (1) lacked

knowledge of the true facts; (2) relied upon the conduct of the other party; and (3) changed its

position to its detriment.  *Id.*; *see also United States ex rel. Damuth Servs. v. W. Sur. Co.*, 368 F.

App'x 383, 387 n.4 (4th Cir. 2010).

  With these principles in mind, the Court turns to Arch's arguments in favor of equitable

estoppel.

### B.  Subcontracts 6 and 7

  Arch argues that IDBS is estopped from recovering for subcontracts 6 and 7 because it

entered those contracts "knowing that there [were] no available funds – the result being to

channel the economic risk to the surety." Def. Mem. 17.  Arch appears to be arguing that, by

entering into those subcontracts, IDBS made a misrepresentation as to the financial security of

JKS.  The Court disagrees.

  As previously discussed, estoppel requires proof that the plaintiff made a false

representation or concealment of fact. *See Damuth Servs.*, 368 F. App'x at 387.  Arch, however,

20

cannot show that IDBS made a misleading representation of fact in connection with subcontracts 6 and 7, or otherwise knowingly acquiesced to such a misrepresentation, for Arch cannot show that IDBS knew that there were no funds available for the subcontracts. The evidence at trial did not support Arch's assertion that "IDBS entered the final two subcontracts with the full knowledge that the HUD funds for the modular had been exhausted and that the only legitimate source for payment was the Arch payment bond." Def. Mem. 17. To the contrary, the evidence showed that John Scanlan, the individual behind general contractor JKS, had assured IDBS that the "funding was in place" and that IDBS believed that he would be able to finance the completion of the project. *See* Tr. 249:17-251:19.

But even if IDBS did enter those contracts knowing that the HUD funds were exhausted and that JKS would be unable to pay for their performance, there would be no basis for estoppel, for an obligee like IDBS has no general duty "to disclose to the surety unrequested information concerning the secured transaction." *Cam-Ful Indus., Inc. v. Fidelity & Deposit Co. of Maryland*, 922 F.2d 156, 162 (2d Cir. 1991) (quoting *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064, 1072 (5th Cir. 1981)). Rather, "the surety bears the burden of making inquiries and informing itself of the relevant affairs of the party for whose conduct it has assumed responsibility." *Id.* (quoting *State v. Peerless Ins. Co.*, 67 N.Y.2d 845, 847 (1986)); *see also United States of America ex rel. Lincoln Elec. Prods. Co. v. Greene Elec. Serv. of Long Island, Inc.*, 379 F.2d 207, 210-11 (2d Cir. 1967) (affirming decision in favor of claimant, notwithstanding claimant's failure to notify surety of principal's "precarious financial condition"). *But cf. General Crushed Stone v. State of New York*, 19 N.Y.2d 737 (1967) (rejecting "any claim of carelessness by the surety . . . as a defense" to surety's affirmative defense alleging fraud). It being well established "that a [contractor's] failure to pay a

21

[subcontractor] in accordance with his contract, without more, imposes upon the [subcontractor] no duty to speak" to the surety, *B.G. Equipment v. Am. Ins. Co.*, 402 N.Y.S.2d 479, 483 (4th Dep't 1978), it necessarily follows that *mere speculation* that a contractor *might* fail to pay a subcontractor in accordance with his contract *in the future*, without more, can likewise impose upon the subcontractor no duty to speak. This, however, is exactly what Arch appears to be arguing: that, because IDBS had reason to suspect that JKS would be unable to pay the subcontracts, it was obligated to inform Arch of its suspicions. The Court declines to impose such an "additional, judicially-created requirement on claimants" and therefore rejects this argument. *Lincoln Elec. Prods.*, 379 F.2d at 210. Having thus determined that IDBS made no false representation or concealment of fact, the Court finds that IDBS is not estopped from recovering on the subcontracts on this basis.

### C. Last Three Buildings

Nor can Arch establish that IDBS is estopped from recovering for the last three buildings—namely, buildings 4, 13, and 11, contained in subcontract 7—due to misrepresentations made by CEO Steven Scheinkman, for the evidence at trial showed that Arch was aware of the true facts surrounding the financing of the Project at the time this issue arose, and that Arch did not rely on IDBS's representations in acting as it did.

Arch's theory that IDBS is estopped from recovering for the last three buildings is premised upon Mr. Scheinkman's June 23, 2011, letter claiming that "[a]ll the contracts, for a total of 880 modular units, [were] in full force and effect." Ex. GGG. This letter is arguably misleading for at least two reasons. First, its statement that "[a]ll the contracts, for a total of 880 modular units are in full force and effect" is in clear tension with JKS's June 8, 2011, letter "cancel[ling]" the last three buildings on June 8, 2011. *Compare* Ex. GGG *with* Ex. EEE.

IDBS's argument that the June 23 letter was not misleading because JKS cancelled only the *dates* to complete the last three buildings, and not the *contracts* themselves is unconvincing. *See* Tr. 43:6-8. There is no evidence that IDBS considered the three buildings to be merely delayed, rather than cancelled, at the time. To the contrary, IDBS employee Jay Kedia referred to the three buildings as "the contract [JKS] cancelled," and, furthermore, expressed surprise when JKS indicated a desire to go forward with building their foundations in a November 3, 2011, email to Scheinkman. Ex. 69.

Second, the June 23 letter is misleading for what it fails to mention. At the time the letter was written, IDBS was well aware that JKS, the bonded party upon whom IDBS relied for payment, was in financial distress and would be unable to perform its portion of the subcontract. *See* Ex. EEE (John Scanlan writing to Scheinkman that "we started the above project with a significant financial whole [sic]" and stating "I will have to cancel the orders"). In the context of a claim on JKS's performance bond, it was misleading for IDBS to write a letter stating that "[a]ll the contracts, for a total of 880 modular units are in full force and effect" without also providing information regarding JKS's financial difficulties. *Cf. B.G. Equipment*, 402 N.Y.S.2d at 483 (finding that BG knew of JRI's false statements to surety "that BG had received its rental payments"); *Damuth*, 368 F. App'x at 389 (finding that claimant had "str[uck] a bargain" with a subcontractor in order to mislead general contractor regarding subcontractor's ability to perform the subcontract). Thus, it may be the case that IDBS acted "affirmatively in concert" with JKS in order to persuade Arch to reject the Developer's performance bond claim and to believe that the Project was well-financed. *Id.* In other circumstances, this conduct might be sufficient to support a defense of estoppel.

23

However, Arch's defense nevertheless fails because the evidence at trial showed that Arch did not rely on the June 23 letter when rejecting the performance bond claim. Rather, as Mr. Patterson credibly testified, Arch rejected the performance bond claim because "the person who [was] claiming to be the obligee . . . [was] no longer the obligee." Tr. 519:4-6. That is, having learned that JKS—and not the former Developer—was the owner of the Project, Mr. Patterson set aside the performance bond claim as separate from the issue of the funding shortfall. *See* Tr. 519:8-12.

Furthermore, trial testimony established that Arch already knew the true facts regarding JKS's finances: Mr. Patterson testified that JKS informed him of the true circumstances surrounding the financing of the Project in June 2011, during his investigation into the Developer's performance bond claim. Among other things, Mr. Patterson knew that "the original deal was going to be a certain amount of 16 million dollars . . . , plus some ownership interest in the property," and that IDBS subsequently demanded the full amount in cash instead. *See* Tr. 519:3-520:6; Ex. HHH. Paterson also understood that this meant that JKS required "additional financing." Tr. 519:25-520:1; Ex. HHH. Having thus been expressly informed of the financing "hole" underlying the June 2011 performance bond claim—and the instant payment bond claim as well—Arch cannot now claim to have been deceived by the fact that Scheinkman's June 23, 2011, letter failed to disclose JKS's financial troubles.

Because Arch did not prove that it relied on IDBS's conduct, or that it was otherwise unaware of the true facts, its claim that IDBS is estopped from recovering for the last three buildings on the basis of the June 23 letter must fail as well.

## IV. Release

Arch's argument that IDBS's recovery is limited by the April 9, 2012, Release and Acknowledgment of Partial Payment ("April 9 Release"), Ex. 174, is also without merit.  It is well established that, "[w]here a waiver form [submitted by a subcontractor] purports to acknowledge that no further payments are owed, but the parties' conduct indicates otherwise, the instrument will not be construed as a release." *Macquesten General Contracting, Inc. v. HCE, Inc.*, 128 F. App'x 782, 785 (2d Cir. 2005) (quoting *W. End Interiors, Ltd. v. Aim Constr. & Contracting Corp.*, 729 N.Y.S.2d 112, 114-15 (1st Dep't 2001)) (second alteration in original). Here, JKS and IDBS's prior conduct clearly demonstrates that "the purpose [of the Release was] to document the current amount of the contract and the amounts previously paid," Tr. 440:4-7— not to release the entire unpaid amount of the contract—and the Court construes it accordingly.

Most significantly, the April 9 Release is identical to seven others previously signed by JKS and IDBS in acknowledgment of prior payments, except for the date and amounts listed. *See* Ex. BBBB (substantially identical "Release and Acknowledgment of Partial Payment" forms signed by IDBS on seven prior occasions).  JKS continued making payments to IDBS even after signing such releases, *see* Tr. 444:1-445:8, conduct "completely inconsistent with [Arch's] theory of general release," *W. End Interiors*, 729 N.Y.S.2d at 114 (construing waiver as receipt for the payments specifically referenced rather than general release of all future payments); *see also Apollo Steel Corp. v. Sicolo & Massaro, Inc.*, 752 N.Y.S.2d 493 (N.Y. App. Div. 4th Dep't 2002) (reversing grant of summary judgment where there was a dispute of fact as to whether the release in question was "one of up to 12 similar releases previously 'routinely executed . . . after each installment of' the work had been completed" and therefore intended to constitute only a "partial or interim release"); *United States ex rel. Perosi Elec. Corp. v. Manshul Constr. Corp.*,

25

940 F. Supp. 492, 504 (E.D.N.Y. 1996)  (finding concession that there continued to be amounts owed under the purportedly released contracts to be "wholly at odds with both the terms of the release and its contention that the releases bar payment for 'extra' work").  Rather, it strongly supports IDBS's contention that the Release was intended merely to document payment of the invoiced amount, as IDBS has consistently maintained since the Release was signed in April 2012. *See* Exs. PP, QQ (communications between IDBS and Arch in which IDBS takes the position that the April 9 Release applied to the currently invoiced amount only); Tr.446:4-47:9. Based upon this conduct, the Court therefore finds that the April 9 Release was not intended to actually release all future payments.

The Court is not persuaded otherwise by the fact that this was the first payment to be received directly from MFC rather than JKS. *See* Def. Mem. 21. This "unique and unusual," Def. Mem. 21, aspect of the April 9 Release does not outweigh its substantial similarity with the releases previously signed by IDBS, *see* Ex. BBBB. Nor is the Court persuaded that IDBS's failure to amend or alter the April 9 Release precludes it from recovery. *See* Def. Mem. 21.  As previously discussed, IDBS had no reason to believe that such amendment was necessary, given its past practice with JKS. *See* Ex. BBBB. That IDBS *did* take the step of altering a subsequent release on a different project in order to emphasize that the document was not "intended to constitute a release or waiver of any claim for amounts not yet paid" is largely meaningless, in light of the fact that IDBS only decided to take this step in June 2012, *see* Ex. 202, more than a month after the dispute over the meaning of the releases first arose, *see* Exs. PP, QQ.

The case relied upon by Arch, *Kay-R Electric Corporation v. Stone & Webster Construction Company, Inc.*, 23 F.3d 55 (2d Cir. 1994), is distinguishable.  In that case, plaintiff Kay-R alleged that defendant Stone & Webster's construction delays had caused it to

"experience[] substantial additional costs for labor, materials, and the storage of materials." *Id.*
at 56. The district court found that Kay-R had released these claims for additional costs by
signing a series of releases purporting to release Stone & Webster "from any claim or claims of
whatever nature for materials furnished, labor performed, or expense incurred to date which is
not included in the above amounts *or noted in the space provided therefor*." *Id.* (emphasis
added). The Second Circuit affirmed, emphasizing that "none of [plaintiff's allegedly] misspent
hours were listed on the blank lines of the requisition/release forms appearing after the phrasing
'Above does not include material furnished, labor performed, or expense incurred for which
written authorization has not been given, as follows.'" *Id.* at 57-58. The releases in this case, by
contrast, provided no equivalent space in which to list non-released claims. *Cf. Gross Constr.
Assocs., Inc v. Am. Mfrs. Mut. Ins. Co.*, No. 07-cv-10639 (LAK) (AJP), 2010 WL 1767218, at *4
(S.D.N.Y. May 4, 2010) (distinguishing *Kay-R* where contested release forms did not direct
release to identify excluded claims in a blank space); *Perosi*, 940 F. Supp. at 504 (distinguishing
*Kay-R* where contested release form did not provide a blank space). Even if there were such a
space, the Court would not be persuaded that IDBS's failure to expressly list non-released claims
could overcome the parties' clear intent to release only the currently invoiced amount, as
demonstrated by their prior course of dealing. *See Apollo Steel Corp.*, 752 N.Y.S.2d at 494
(reversing grant of summary judgment where "parties' course of dealing" created a factual
dispute as to the meaning of a release purporting to "waive, release and discharge" defendant
from all claims).

## V. Liability Under Payment Bond

Having rejected Arch's affirmative defenses, the Court turns to IDBS's claim under the
payment bond.

### A.  Whether IDBS Has Improperly Argued an Account Stated Claim

As an initial matter, the Court considers Arch's argument that IDBS is barred from using its invoices to meet its burden of establishing the amount of damages.  In particular, Arch argues that reliance on the invoices creates an impermissible claim for an "account stated."  *See* Pl. Mem. 1 (citing Ex. NN; Myers Aff. ¶ 54); Def. Opp. 1. The Court disagrees.

Arch's argument appears to derive from a misreading of the 104-year-old New York Supreme Court case *Chicago Crayon Co. v. Slattery*, 68 Misc. 148 (1910).  In that case, the court sustained a demurrer of a complaint pleading only an account stated against a surety on the ground that "[s]ureties can be charged only where the complaint is brought within the very terms of their contract," and "[b]reach of the contract by the principal [was] nowhere alleged" in the complaint.  *Id.* at 151; *see also Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 582 F. Supp. 1279 (S.D.N.Y.) (granting summary judgment where it was "beyond dispute that no default occurred in this case"), *rev'd on other grounds*, 751 F.2d 543 (2d Cir. 1984).  *Chicago Crayon*, however, is inapposite, as Arch has not—and cannot—allege that IDBS has failed to state a claim for recovery under the terms of the bond.  IDBS's complaint plainly alleges that JKS has "failed and refused to pay" amounts owed under the subcontract and that IDBS accordingly has "a proper claim against Arch under the terms of the Payment Bond."  *See* Compl. ¶¶ 23-39. *Cf. Chicago Crayon Corp.*, 68 Misc. at 151 (sustaining demurrer because "[b]reach of the contract by the principal is nowhere alleged").

As *Chicago Crayon* emphasizes, the "rules of pleading" that bar the statement of a claim for an account stated against a surety are separate and distinct from the rules governing "the admissibility of evidence of such admissions" for purposes of determining the extent of a surety's liability.  68 Misc. at 151.  In this case, it is plain that IDBS has offered the invoices as

*evidence* of Arch's liability, and not in order to plead a claim for account stated. *Cf. Letendre v.*

*Hartford Accident & Indem. Co.*, 21 N.Y.2d 518, 521-23 (1968) (finding the inculpatory

statements of a principal admissible against its surety); *Townsend v. Everett*, 4 Ala. 607, 611-12

(1843) (finding that facts establishing an account stated were admissible "evidence both against

[the defendant] and his surety"). Whether the invoices constitute admissible evidence for this

purpose is a distinct question that the Court addresses separately below.

### B. Whether IDBS Has Proven Its Entitlement to Damages

Now the Court must determine whether IDBS has proven its entitlement to damages. *See*

*Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (citing *Berley Indus., Inc.*

*v. City of New York*, 45 N.Y.2d 683, 686 (1978)) ("It is fundamental to the [New York] law of

damages that one complaining of injury has the burden of proving the extent of the harm

suffered."). The payment bond at issue provides "that every claimant . . . who has not been paid

in full before the expiration of a period of ninety (90) days after the date on which the last of

such claimant's work or labor was done or performed . . . may sue on this bond . . . . for such

sum or sums as may be justly due claimant, and have execution thereon." Ex. 150. The Court

finds that IDBS is a claimant within the meaning of the bond, that it has not been paid in full, and

that it is more than ninety days since it last performed work on the Project. Thus, the only

remaining question is the amount of the sum that is justly due to IDBS, pursuant to the payment

bond. The Court turns to this question now.

### 1. Amount of Subcontracts

"When a contractor defaults or breaches an agreement with a subcontractor, that

subcontractor ordinarily is entitled to 'collect . . . in contract for the value of what plaintiff ha[s]

lost—that is, the contract price, less payments made and less the cost of completion.'" *Arch Ins.*

*Co.*, 584 F.3d at 40 (quoting *New Era Homes Corp. v. Forster*, 299 N.Y. 303, 307 (1949)).

Here, the total price of the subcontracts was $23,921,903.00. This finding is supported by the

evidence in the record, and particularly by the credible testimony of IDBS CFO Jolene Myers,

*see* Ex. FFFF ¶¶ 54-65, and the invoices kept by IDBS, *see* Exs. N, O, P, Q, R, S, and T

(business records documenting amounts invoiced to and owed by JKS), which were submitted to

Arch as part of its claims process, *see* Exs. KK, LL, and U. In reaching this conclusion, the

Court necessarily finds that IDBS has sufficiently proven its entitlement to the material

surcharges as set forth in Ms. Myers' testimony and the supporting invoices.

Arch's attempt to preclude consideration of the invoices by citation to *Chicago Crayon* is

unavailing. While *Chicago Crayon* prohibits the statement of a claim for an account stated

against a surety, it acknowledges that "[a]n account stated between the obligee and the principal

debtor" may constitute an "admission of the principal debtor as against the sureties," which is

governed by the rules of evidence and not "the rules of pleading." 68 Misc. at 151. Here, the

rules of evidence permit the consideration of the invoices, which were admitted at trial pursuant

to the business records exception to the rule against hearsay. *See* Tr. 426:12-435:2; Fed. R. Evid.

803(6). Arch has provided the Court with no reason to doubt the accuracy of Ms. Meyers'

testimony or the invoices, and the Court is satisfied that IDBS has met its burden of establishing

the price of the subcontracts.

### 2.  Cost of Performance Bond

Arch argues that the contract price must be reduced by the $800,000 in overhead costs

charged by IDBS to obtain a performance bond on the ground that "claims are limited to 'labor,

material, or both, used or reasonably required for use in the performance of the contract.'" Def.

Mem. 23.  In other words, Arch argues that IDBS is precluded from recovering overhead costs under the performance bond.  The Court disagrees.

It is well established that, in the "absence of any showing of fraud or collusion," the amount "justly due" to a subcontractor under a payment bond "for the benefit of persons supplying labor, services, and materials in the performance of the contract" is "determined by the contract price." *Lincoln Elec. Prods.*, 379 F.2d at 208-10; *see also Arch Ins. Co.*, 584 F.3d at 40 ("When a contractor defaults or breaches an agreement with a subcontractor, that subcontractor ordinarily is entitled to collect . . . 'in contract for the value of what plaintiff had lost—that is, *the contract price*, less payments made and less the cost of completion.'") (emphasis added); *Empire Enters. JKB, Inc. v. Union City Contractors, Inc.*, 660 F. Supp. 2d 492, 510-11 (W.D.N.Y. 2009) (finding that "settled authority supports an award of damages" on the basis of the contract price) (collecting cases).  According to this rule, "the surety is obligated to pay the compensation to which the parties have agreed," even when this amount "exceeds the cost of labor, materials, and overhead."  *United States ex rel. Woodington Elec. Co., Inc. v. United Pac. Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir. 1976) (citing *Price v. H.L. Coble Constr. Co.*, 317 F.2d 312, 318 (5th Cir. 1963)) (rejecting argument that "profits realized from the performance of entire government contracts do not constitute payment for labor and materials under the Miller Act").  Here, Arch has made no showing that the contract price was the result of fraud or collusion.  Accordingly, the Court determines the amount of damages by looking to the price of the subcontract, without further inquiry into the costs of obtaining the subcontractor performance bond or other overhead costs.

The Court is not persuaded otherwise by Arch's citation to *Gals, Inc. v. Gemma Construction Co., Inc.*, 784 N.Y.S.2d 51 (1st Dep't 2004).  In that case, the court applied

31

language in the payment bond limiting coverage to "[m]aterials and supplies . . . *used or consumed* by said Principal or any Subcontractor [on the site]" to find that the claimant was not entitled to recover its overhead costs or lost profits for portions of the contract that had not actually been performed. *Id.* at 52-53 (first alteration in original, emphasis added). In reaching that conclusion, the court reasoned that such costs were not covered by the terms of the payment bond—and did not apply any general principle precluding subcontractors from recovering overhead or lost profits. *See id.* In this case, however, it is undisputed that IDBS has completed the entirety of its obligations under the subcontracts and is accordingly entitled to recover for its performance under the terms of the payment bond. *See* Ex. 150. Under these circumstances, Arch must be held liable for the entire amount of the subcontracts, including overhead and profits, just as the defendant surety in *Gals* would have been, had it actually completed performance of its subcontract, as required by the terms of the payment bond.

### 3.  Set Credits

Arch further contends the contract price should be reduced by $1,151,005 for unclaimed set credits. *See* Def. Mem. 24-25. Again, the Court disagrees.

Each of the seven subcontracts provides that "the Contract Sum takes into account the Subcontractor's best estimate as to the maximum costs of setting the units," and that "[a]ny decrease in the Subcontractor's actual costs shall result in an adjustment to the Contract Sum and be covered by a change order." *See, e.g.,* Ex. C ¶ 9. In the course of performing the subcontracts, IDBS gave JKS only $79,545 in set credits to subcontract 1, which was entered into in October 2010. No set credits were given with respect to subcontracts 2 through 7. Arch asserts that $1,151,005 in further "set credits" are owed, based upon the difference between an August 2009

estimate predicting that setting the modular would cost $3,334,800, Ex. 3, and the fact that the actual price of the setting contract reached on December 23, 2010, was for $2,104,250, Ex. 210.

However, the Court finds that the absence of any set credits to subcontracts 2 through 7 was adequately explained at trial, during which Steve Scheinkman and Jolene Myers credibly testified that the reduced set cost estimate was taken into account in determining the price of those subcontracts. *See* Tr. 86:3-19; 366:3-10. This testimony is not at all inconsistent with the documents relied upon by Arch, as the contract fixing the set costs at $2,104,250, *see* Ex. 210, was signed just five days after IDBS and JKS signed subcontracts 2, 3, 4, and 5, *see* Exs. D, E, F, and G, and months before they signed subcontracts 6 and 7, *see* Exs. H and I. Moreover, Arch can point to no change orders or other disputes indicating that JKS felt that a set credit was owed. Under these circumstances, the Court is persuaded that IDBS and JKS were in a position to accurately estimate the cost of setting at the time they entered into the later subcontracts, and therefore finds that the contract price need not be reduced to reflect unclaimed set credits.

### 4. Summary

As previously discussed, "[w]hen a contractor defaults or breaches an agreement with a subcontractor, that subcontractor ordinarily is entitled to 'collect . . . in contract for the value of what plaintiff has lost—that is, the contract price, less payments made and less the cost of completion.'" *Arch Ins. Co.*, 584 F.3d at 40 (quoting *New Era Homes Corp.*, 299 N.Y. at 307). Accordingly, IDBS is entitled to recover $4,748,191.00, representing its $23,921,903.00 contract price less the $19,173,712.00 in payments received. Because IDBS completed its portion of the contract, no amount need be deducted to reflect the cost of completion.

### C. Prejudgment Interest

Finally, the Court must determine the amount of prejudgment interest due.

33

IDBS claims that it is owed prejudgment interest at a rate of 1% per month, pursuant to the Prompt Payment Act, N.Y. Gen. Bus. Law § 756-b.  Pl. Mem. 2.  Section 756-b(1)(b) provides: "[n]otwithstanding any contrary agreement, if any interim or final payment to a subcontractor is delayed beyond the due date established in [§ 756-a(3)(b)], the contractor . . . shall pay its subcontractor interest, beginning on the next day, at the rate of one percent a month or fraction of a month on the unpaid balance, or at a higher rate consistent with the construction contract."  Pursuant to § 756-a(3)(b), "[t]he contractor's . . . payment of subcontractor or material supplier's interim or final invoice shall be made on the basis of a duly approved invoice of the work performed and materials supplied during the billing cycle."  That subsection further provides that, "[u]nless the provisions of [the Prompt Payment Act] provide otherwise, the contractor . . . shall pay the subcontractor strictly in accordance with the terms of the construction contract."  *Id.* at § 756-a(3)(b)(i).

The Court agrees that IDBS is owed prejudgment interest at the rate set forth in § 756-b. The plain language of the statute indicates that it applies in this case.  The unpaid amounts on the subcontracts are due and owing under "the terms of the construction contract," Gen. Bus. Law § 756-a(3)(b), and the contractor JKS therefore owes its subcontractor IDBS "interest . . . at the rate of one percent a month or fraction of a month on the unpaid balance," Gen. Bus. Law § 756-b-(1)(b).

The Court further concludes that the obligation to pay prejudgment interest at the rate set forth in Gen. Bus. Law § 756-b applies to Arch as surety for JKS.  Under New York law, it is well established that a surety's liability encompasses "interest in addition to [the amount specified in the undertaking] from the time of default by the surety."  *United States Fidelity & Guar. Co. v. Brastrepo Oil Servs. Co.*, 369 F.3d 34, 78 (2d Cir. 2004) (quoting N.Y. Gen. Oblig.

34

Law § 7-301 (McKinney 2001)).  This rule is consistent with the general principle that "a surety's liability to perform under a performance bond is coextensive with that of the principal." *Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, 10-cv-9457 (SAS), 2011 WL 2436703, at *3 (S.D.N.Y. June 16, 2011) (quoting *Brastrepo*, 369 F.3d at 67)).  For construction contracts, the New York state legislature has determined that the amount of prejudgment interest to be applied is "one percent a month," and the Court will apply that amount here.  N.Y. Gen. Bus. Law § 756-b(1)(b).

The Court is unpersuaded by Arch's attempt to substitute the lower 9% *annual* rate of prejudgment interest provided for in N.Y. C.P.L.R. § 5001(b) for the higher 1% *monthly* rate set forth in N.Y. Gen. Bus. Law § 756-b.  *See* Def. Opp. 3.  In support of its position that the lower general rate should apply, Arch cites *Bruce Supply Corp. v. D & M Plumbing & Heating Corp.*, 737 N.Y.S.2d 642 (2d Dep't 2002), in which the court refused to apply § 756-b and applied § 5001(b) instead.  *See* Def. Opp. 3.  However, that case predates the construction contract-specific rate set forth in the Prompt Payment Act, which was enacted in 2002 and became effective January 14, 2003.  *See* 2002 Sess. Law News of N.Y. Ch. 127 (S. 7735-A) (McKinney's).  Subsequent New York courts have recognized that the obligations of contractors and sureties under § 5001 were modified by § 756-b, and the Court will do the same here. *Compare Oakwood Realty Corp. v. HRH Constr. Corp.*, 858 N.Y.S.2d 677, 679 (2d Dep't 2008) (declining to apply the higher rate set forth in Gen. Bus. Law § 756-b to surety, where underlying construction contract had been executed "two years prior to the effective date of the statute"), *with W & W Glass, LLC v. 1113 York Ave. Realty Co.*, 979 N.Y.S.2d 318, 320 (1st Dep't 2014) (reversing trial court decision awarding subcontractor plaintiff prejudgment interest at 9% under

§ 5001 and finding that "[p]laintiff is entitled to interest at the rate of 1% per month" under §§ 756-a; 756-b).

Nor is the Court persuaded by Arch's argument that § 756-b must be construed in light of § 756-a(3)(b)(ii), which requires a "contractor to pay to the subcontractor . . . the full or proportionate amount of funds received from the owner for each subcontractor's work . . . seven days after receipt of good funds for each interim or final payment." Arch seems to argue that, pursuant to § 756-a(3)(b)(ii), no amounts are yet due to IDBS because "IDBS has not alleged that JKS failed to pay over amounts that JKS received from the owner for IDBS's work." Def. Opp. 2-3. But § 756-a(3)(b)(ii) does not operate to excuse payment to subcontractors on the basis of the general contractor's failure to receive payment from the owner. To the contrary, such "pay-when-paid" provisions, which make the general contractor's obligation to pay its subcontractors contingent upon the general contractor's receipt of payment from the owner, are "void and unenforceable as contrary to public policy" in New York. *West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co.*, 87 N.Y.2d 148, 158 (1995). Rather than excusing delayed payment to subcontractors, § 756-a(3)(b)(ii) is best understood as outlining one set of circumstances under which payment to subcontractors is mandatory, in addition to the requirement that subcontractors be paid pursuant to the terms of their contract pursuant to § 756-a(3)(b)(i). *See also* § 756-a ("It is the policy and purpose of this article to *expedite* payment of all moneys owed to those who perform contracting services pursuant to construction contracts.") (emphasis added).

The Court also rejects Arch's contention that IDBS's claim to interest must be reduced pursuant to its purported agreement "to defer any claim until December 31, 2012." Def. Opp. 3. The document cited by Arch in support of its claim was sent by IDBS on April 12, 2012, and

36

warned Arch that, "if [the demanded payment] [was] not made *immediately*, IDBS [would] have no choice but to pursue recovery of the entire debt," and reserved IDBS's "right to seek all amounts due and owing from [JKS] and/or Arch." Ex. MM (emphasis added).  However, the demanded payment had still not been made nine days later, on April 23, 2012, when IDBS exercised its expressly reserved right under the Amendment to accelerate the entire amount of the debt. Ex. Y, U.  It was not until four days later, on April 27, 2012, that Arch made the first installment of the partial payment demanded in the April 12 letter. Ex. FFFF ¶ 49.  Under these circumstances, the Court finds that the forbearance agreement does not bar or otherwise delay IDBS's claim.

### VI. Conclusion

Based on the findings of fact and conclusions of law set forth above, the Court concludes that Plaintiff has shown by a preponderance of the evidence that it is entitled, under the payment bond, to recover from Defendant $4,748,191.00, plus prejudgment interest at the monthly rate of 1%, pursuant to N.Y. Gen. Bus. Law § 756-b.  The Clerk of Court is therefore directed to enter judgment in favor of Plaintiff and terminate this action.

SO ORDERED.

Dated: September **23**, 2014
      New York, New York

                                 ALISON J. NATHAN
                           United States District Judge